IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILCO INVESTMENTS, LTD et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>MARTIN et al.,<br><br>  Defendants. | No. C 10-02785 CRB<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

This is a securities suit about allegedly false and misleading statements made by a pharmaceutical company about the safety and efficacy of two of its drugs. Defendants Elan Corporation (the pharmaceutical company) and three of its officers and directors have moved to dismiss the Complaint, arguing that it fails to state a claim. The Court finds that Defendants are correct, and GRANTS their Motion.

**I.   BACKGROUND**

Plaintiffs Philco Investments, David Mauer, and David and Maria Rosenbaum are investors who, in June and July 2008 (the "Relevant Period"), purchased August 2008 strike price call contracts for the ADRs of Elan Corporation. Compl. ¶ 1. Plaintiffs allege that Defendants misled investors through its statements in June and July 2008 about two of Elan's drugs: (1) a drug it was developing to treat Alzheimer's, called Bapineuzumab, and (2) a drug then marketed to treat multiple sclerosis, called Tysabri. Id. ¶ 2. Following

1  Defendants revelations at the end of July 2008 that the drugs were not as effective (in the
2  case of Bapineuzumab) or safe (in the case of Tysabri) as previously understood, Elan's price
3  dropped from a high of $36 during the Relevant Period to a low of $9.93.  Id.  The drop
4  rendered Plaintiffs' call options, which had a $30 or higher strike price, worthless.  Id.

The Complaint's assertions about Bapineuzumab and Tysabri are as follows.

### A.     Bapineuzumab

Elan developed Bapineuzumab in association with Wyeth, another pharmaceutical company, for the treatment of Alzheimer's disease.  Compl. ¶ 7.  To win FDA approval for Bapineuzumab, Elan planned to conduct both phase 2 and phase 3 trials.  Id. ¶ 9.  Phase 2 trials are designed to assess dosing requirements, efficacy at particular doses, and safety on a medium sized group of patients.  Id.  Phase 3 trials expand the safety and efficacy assessment to a larger group of patients.  Id.

Before they began the phase 2 trial, Elan and Wyeth agreed that they would conduct an "interim review" of the phase 2 results to determine whether and how to proceed to phase 3.  Id. ¶ 10.  They agreed that they would initiate a phase 3 trial only if the interim review showed that Bapineuzumab was significantly outperforming the placebo in phase 2.  Id.  They informed investors that, to initiate phase 3 trials before phase 2 was complete, "certain very specific criteria [would] need to be met."  Id. ¶ 11.  The Complaint alleges that they agreed to assess the drug's performance using the two primary tests used in the study, the Alzheimer's Disease Assessment Scale-Cognitive Subscale ("ADAS-cog") and the Disability Assessment Scale for Dementia ("DAD").  Id. ¶ 10.  They declared that, to proceed to phase 3, the interim results of phase 2 would have to be "spectacular," "strong," and "very meaningful."  Id. ¶ 11[1]

---

[1] In May 2006 Defendants stated on a conference call that they would not need "statistical significance" to move forward to Phase 3, only "a strong signal."  Hibbard Decl. Ex. J at 9-10.  The Court can take judicial notice of the conference call transcript, not for the truth of the matter asserted but for the fact that the statements were made on the date specified.  See Brodsky v. Yahoo! Inc., 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009).  In addition, Defendants Martin and Ekman stated at a January 2007 JP Morgan Health Conference that "We've got four different clinical endpoints to the trial, cognition, memory, quality of life and imaging. . . . What we've given the independent review group is very specific criteria that we're looking for.  And we came up with that criteria by looking at a vast

2

In May 2007, Defendants conducted the interim review of phase 2, and were disappointed. Id. ¶ 12. Bapineuzumab did not outperform the placebo under either the ADAS-cog or DAD tests. Id. And higher doses of the drug were associated with vasogenic edema, a potentially dangerous accumulation of fluid in the brain, in patients that carried the Apolipoprotein E4 ("ApoE4") allele. Id. There was an encouraging result, however: non-carriers of the ApoE4 allele (40-70% of the Alzheimer's population) seemed to perform better on Bapineuzumab than carriers of the allele did. Id.

Even though Bapineuzumab did not pass the "strict criteria of the interim review," Defendants decided to proceed with phase 3 trials. Id. ¶ 13. They designed phase 3 trials that separated ApoE4 carriers from non-carriers, and did not use the higher doses of Bapineuzumab that had been associated with vasogenic edema. Id. Defendants did not inform investors that "they were disregarding the failed interim review." Id. ¶ 14. Instead, on May 21, 2007, Elan issued a press release announcing that it was initiating phase 3 trials, "thus communicating to investors that Bapineuzumab had met the strict criteria of the interim review with strong and spectacular results." Id. The press release stated in part:

> This decision [to initiate phase 3 trials] was based on the seriousness of the disease and the totality of what the companies have learned from their immunotherapy programs, including a scheduled Interim look at data from an ongoing Phase 2 study, which remains blinded. No conclusion about the Phase 2 study can be drawn until the study is completed and the final data are analyzed and released in 2008.

Hibbard Decl. Ex. K.[2] In the day following the May 21, 2007 press release, Elan's ADRs jumped 12.5%, to over $12. Compl. ¶ 14.

When the phase 2 trials were completed in April 2008, Bapineuzumab failed to outperform the placebo by a statistically significant margin on the ADAS-cog and DAD, and higher doses were not correlated with greater improvement. Id. ¶ 16. There were also a number of other troubling side effects associated more strongly with Bapineuzumab than the

---

array of data . . . that lets us anticipate which of these endpoints are going to move when and to what amplitude. . . . it has to be strong, it has to be very meaningful. There are companies that decide to move into Phase III based on circumstantial evidence of efficacy, et cetera, but that's not the way we're going to operate." Compl. ¶ 70.

[2] The Court may take judicial notice of this document as it was cited in the Complaint. See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999).

placebo. Id. Because the phase 3 trials were still enrolling, Defendants wanted to delay revealing the bad news. Id. ¶ 17. They decided to announce the full results at the July 29, 2008 Alzheimer's Association's International Conference on Alzheimer's Disease 2008 ("ICAD"), and in the meantime made positive statements about Bapineuzumab.[3]

On June 17, 2008, Defendants issued a press release announcing that the phase 2 patients who were non-carriers of the ApoE4 allele performed better than those on placebos to a statistically significant degree. Id. ¶ 20. Though it "acknowledged that [carriers of the ApoE4 allele] did not do so," "it failed to disclose the magnitude of the miss, the absence of dose response, the unusually swift decline of the placebo patients, or the troubling safety results." Id. The press release stated in part:

> Primary Efficacy Endpoints in Overall Study Population Not Statistically Significant . . . Detailed Data Presentation At ICAD July 29, 2008 . . . In non-carriers of the Apolipoprotein (ApoE4) allele, estimated in the literature to be from 40 to 70 percent of the Alzheimer's disease population, post-hac analysis showed statistically significant and clinically meaningful benefits associated with bapineuzumab treatment on several key efficacy endpoints. . . . In similar post-hac analysis of carriers of the ApoE4 allele, no clinical benefits or statistically significant effects were observed on efficacy endpoints or the brain volume endpoint. . . . In carriers, serious adverse events were more frequently observed in bapineuzumab-treated patients than in placebo patients. In addition, vasogenic edema was reported in the treated population with an increased frequency in carriers and at higher doses.

Hibbard Decl. Ex. R.[4] In the day following the June 17, 2008 press release, the price of Elan's ADRs jumped another 10%. Compl. ¶ 20.

Then, at the July 29, 2008 ICAD conference, Defendants disclosed the full results of the phase 2 study. Id. ¶ 26. The results included the following:

- The phase 2 study showed no dose response.
- Patients taking placebo showed a larger than expected cognitive decline, which might have exaggerated Bapineuzumab's results.

---

[3] The Complaint includes positive statements that Defendants allegedly made to private investors, but Plaintiffs concede in their Opposition that their "right to relief here does not depend on these private statements as they were not made to plaintiffs." Opp. at 14 n.11. Accordingly, this Order only addresses the public statements made by Defendants.

[4] The Court may take judicial notice of this document as it was cited in the Complaint. See Silicon Graphics, 183 F.3d at 986.

- Defendants changed the statistical model post hac from linear to curvilinear, without which "they could not have claimed that Bapineuzumab outperformed placebo by a statistically significant margin, even in the ApoE4 non-carrier group."

- There was no short term advantage for Bapineuzumab.

- Using the Mini Mental State Examination (a key measure of cognitive function), there was no significant signal that Bapineuzumab worked better than placebo.

- Nearly 10% of patients in the study who were taking Bapineuzumab developed vasogenic edema.

- There were three deaths reported in the group taking Bapineuzumab, as well as nine additional adverse affects that were more frequent in patients taking Bapineuzumab than placebo.

- Bapineuzumab failed to show a statistically significant benefit compared to placebo per the original protocol, by a large margin.

Id. ¶ 26.

According to Plaintiffs, these results, "[f]ar from being 'strong' and 'spectacular,' . . . meant that the Phase 3 trials would likely to have to run their full 18-month courses before any FDA approval was possible" and "virtually eliminated any chance that Elan could receive FDA approval as planned in September 2008 before the Phase 3 trials were finished." Id. ¶ 28. Following the disclosure at the ICAD conference, Elan's ADRs, which were trading at $33.75 per share on July 29, 2008, dropped 42% in one day. Id. ¶ 27. The following day (as a result of the Tysabri disclosure discussed below), they dropped again, to below $10 per share. Id.

**B.  Tysabri**

During the Relevant Period, Elan's biggest-selling drug was Tysabri, which was used to treat autoimmune diseases such as multiple sclerosis. Compl. ¶ 3. Tysabri had been removed from the market in 2005 after two patients taking it died from a rare neurological disorder called progressive multifocal leukoencephalopthy ("PML"). Id. ¶ 3. A safety evaluation was done, and established an Independent Adjudication Committee ("IAC") to review any suspected cases of PML. Id. ¶ 4. The IAC determined that patients who met all three of the following criteria would be diagnosed as having confirmed PML: (1) progressive clinical disease; (2) MRI findings typical of PML; and (3) detectable virus DNA in the

cerebrospinal fluid. Id. ¶ 5. In 2006, the FDA approved Tysabri's reintroduction to the market. Id. ¶ 6.

On June 11, 2008, Defendant Martin publically stated at the Goldman Sachs 29th Annual Global Healthcare Conference that Elan was adding roughly 5,000 Tysabri patients a quarter, that every 10,000 Tysabri patients resulted in $100 million in profit for Elan, and that Elan saw good traction with Tysabri in the US and Europe. Id. ¶ 18. On July 10, 2008, in the Irish Independent newspaper, Defendant Cooke stated that the increase in Tysabri patients in the first quarter "underscores the confidence that Elan's total revenue for this year will approach the $1bn mark and we will achieve our target of having $100,000 patients on Tysabri by the end of 2010." Id. ¶ 90.

On July 22, 2008, Biogen (not a defendant) held a conference call, during which it announced that there had been no new confirmed cases of PML. Id. ¶ 21. Sometime prior to this statement, however, 12 suspected cases of PML involving Tysabri patients were privately reported in the FDA Adverse Event Reporting System (AERS) database. Id. ¶ 22.[5]

On July 24, 2008, in an earnings call with investors, Defendant Cooke reported that "neurologists and their MS patients in North America and Europe were increasingly confident that Tysabri was safe when used on its own." Id. ¶ 24. He stated to the Associated Press: "the further we go (without any new PML cases), the more comfortable that people become and the more that patients demand to be put on Tysabri." Id. He specifically mentioned "no additional confirmed cases of PML." Id.

On July 30 and 31, 2008, having "withheld material information of 2 additional PML cases from the public for almost 2 months," Biogen and Elan announced that two more patients had contracted PML from taking Tysabri. Id. ¶ 30. Defendants stated: "In summary, we are reporting two cases of PML which were confirmed to us very recently." Id. ¶ 119. As a result of this disclosure, shares in Elan dropped 60% on the Irish Stock Exchange, 23% on the Nasdaq, and 29% on the NYSE. Id.

---

[5] The Complaint alleges that at least 2 of these suspected cases were reported by doctors and known by Defendants as early as May 2008. Id. ¶ 100.

6

**II.     LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). For the purposes of evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). The complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). That requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged." Id.

Claims for fraud must meet the particularity requirements of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Further, Plaintiffs are required to state with particularity the facts giving rise to a strong inference of Defendants' scienter. See 15 U.S.C. § 78u-4(b)(2). "The inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations" and a court 'must consider plausible nonculpable explanations for the defendant's conduct." See Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

**III.    DISCUSSION**

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act, a plaintiff must plead (1) a material misrepresentation or omission; (2) scienter; (3) a

connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008). Defendants here move to dismiss, arguing that Plaintiffs have not adequately alleged false and misleading statements, and have failed to adequately plead scienter.

### A. Tysabri

The Court will begin with Plaintiff's allegations about Tysabri.

#### 1. Falsity

The Complaint's allegations as to Tysabri deal with its commercial potential, such as "Elan [seeing] good traction with Tysabri in the US and Europe," id. ¶ 18, as well as its safety, such as there being "no new confirmed PML cases on July 22, 2008," id. ¶ 22.[6] The Complaint asserts that these statements were false or misleading because Defendants did not disclose 12 suspected cases of PML. Id. ¶ 22.

The statements were not false, however: 12 suspected cases are not the equivalent of a confirmed case.[7] Nor does the Complaint allege with particularity why the statements are misleading. Critically, it fails to explain the significance of the 12 suspected cases either statistically or medically. For example, the Complaint does not assert how many patients were taking Tysabri at the time; 12 suspected cases of PML would be quite alarming if, for example, just 24 patients total were taking the drug.[8] In addition, the Complaint does not explain why– even if two of the suspected cases were known by Defendants as early as May 2008, see id. ¶ 100 – suspected cases of PML mean that there is likely to be a confirmed case

---

[6] The Complaint also includes statements about Tysabri's commercial success, such as that Elan's performance had been "strong," Compl. ¶ 25, and that "every 10,000 Tysabri patients resulted in $100 million in profit for Elan," id. ¶ 18. But it does not allege that any of these statements were untrue.

[7] The Court also notes that Defendants had asserted in June 2006 that they were "committed to communicate only fact-based information regarding confirmed cases of PML to the MS community" and would not "speculate on every rumor that pops up in the press or in other venues." Hibbard Decl. Ex. CC at 5. The Court can take judicial notice of the conference call transcript, not for the truth of the matter asserted but for the fact that the statements were made on the date specified. See Brodsky, 630 F. Supp. 2d at 1111.

[8] The Court suspects that there were far more than 24 patients taking Tysabri, as it was Elan's best-seller. Compl. ¶ 3.

8

of PML. And the Complaint fails to state whether either of the two confirmed cases announced on July 30 and 31 arose out of the 12 suspected cases. Lacking such particularized allegations as to the significance of the 12 suspected cases, the Complaint has failed to allege falsity as to the Tysabri statements.

### 2. Scienter

The Complaint's allegations of scienter as to the Tysabri statements are also insufficient. The Complaint alleges that "Defendants were motivated to conceal 12 suspected PML cases because the prior suspension of the drug in 2005 had cast doubts over the future of the predicted blockbuster and because the news would be a huge blow to Tysabri and the company's financials." Compl. ¶ 139. But the "inference of scienter must be . . . strong in light of other explanations" and a court 'must consider plausible nonculpable explanations for the defendant's conduct." See Tellabs, 551 U.S. at 324.

Concern for the bottom line is not the only possible motive for keeping quiet about 12 suspected cases of PML. In fact, a more likely motive is a desire to avoid creating an unfounded panic among patients, doctors, and the market. That the IAC established to investigate PML determined that patients had to meet three criteria to be diagnosed, Compl. ¶ 5, demonstrates both that patients can show some symptoms of PML without developing a confirmed case, and that it is actually important to make accurate diagnoses. The Court cannot imagine that the law requires pharmaceutical companies in Elan's position to announce a very small number of suspected instances of even a very serious side effect. This case is therefore distinguishable from Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1183 (9th Cir. 2009) cert. granted, 130 S.Ct. 3411 (2010), which involved the withholding of "reports of adverse affects of and lawsuits concerning the product responsible for the company's remarkable sales increase," and not speculative reports of "suspected" adverse affects. Importantly, the Complaint's allegation that Defendants were trying to conceal the 12 suspected PML cases is even less plausible in light of the Complaint's assertion that the suspected cases were reported in the AERS database, to which the public presumably had access. Id. ¶ 22.

9

Finally, Plaintiff argues that Defendants' disclosure of the two confirmed PML cases just one week after stating publically that there were "no additional confirmed cases of PML," arguably supports an inference of scienter. Opp. at 24. However, this still does not save the Tysabri claims. Temporal proximity of an allegedly fraudulent statement and a later disclosure can bolster an inference of knowledge, see Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 988 n.5 (9th Cir. 2008), but it is not enough to state a claim, see Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001). Moreover, Plaintiffs here do not allege that Defendants knew of the confirmed cases earlier than they told the public, only that they knew of the suspected cases.

Accordingly, the Complaint fails to adequately allege scienter as to the Tysabri statements. The Court therefore dismisses the Tysabri claims with leave to amend.

### B.     Bapineuzumab

Next, Plaintiff's allegations about Bapineuzumab deal primarily with the impression Defendants created that they would only proceed to phase 3 if the results of phase 2 were "spectacular," and the incomplete information Defendants provided about the results of phase 2. The Court finds that these allegations fail to adequately allege falsity, and does not reach the issue of scienter.[9]

#### 1.     Falsity: Statements About Commencing Phase 3

The Complaint alleges that "[o]n May 21, 2007, investors and analysts were led to believe that the results of the Phase 2 Alzheimer Study met the strict, predetermined criteria of the interim analysis, which required 'strong' and 'spectacular' data, when defendants and Wyeth issued a press release announcing the initiation of the Phase 3 clinical trials of Bapineuzumab." Compl. ¶ 72. Plaintiffs' claim is thus not that the Defendants' May 21,

---

[9] See In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d 1165, 1208 (D.N.M. 2010) ("Statements Not False When Made Do Not, Standing Alone, Support a Strong Inference of Scienter").

10

2007 statement was false by itself, but that it was misleading in light of their earlier statements that phase 3 would only commence under certain circumstances.[10]

Defendants argue, rightly, that terms like "strong" and "spectacular" are not actionable under the securities laws.[11]  See Glen Holly Entm't Inc. v. Tektronix Inc., 352 F.3d 367, 379 (9th Cir. 2003) (reasonable consumer cannot rely on "generalized, vague and unspecific assertions, constituting mere 'puffery'"); In re Copper Mountain Sec. Litig., 311 F. Supp. 2d 857, 868-69 (N.D. Cal. 2004) (holding that words like "strong" and "very positive" are not actionable, noting that "vague statements are not actionable because 'they are considered immaterial and discounted by the market' and because 'reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions"). Moreover, Plaintiffs point to no cases in which courts have found a duty to update vague and general statements.  See also In re Foxhollow Techs., Inc. Sec. Litig., 359 Fed. App'x 802, 804-05 (9th Cir. 2009) ("Those circuits that have recognized a duty to update true statements have said that it applies only to statements that are clear, factual, and forward-looking"); In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1078 (N.D. Cal. 2001) (finding no duty to update where the statements lacked definite positive projections).

Plaintiffs argue, however, that the Complaint alleges specifically why the phase 2 interim data failed to meet the predetermined criteria: not merely because the data was not "spectacular," but because Elan and Wyeth had agreed to assess it using the ADAS-cog and DAD tests, because Bapineuzumab did not outperform the placebo in either test, and because higher doses of the drug were associated with vasogenic edema. Opp. at 5. If, in fact, investors understood that "strong" and "spectacular" were proxies for a "very specific criteria" of which the investors were aware– i.e., success using the ADAS-cog and DAD

---

[10] The Court notes that the May 21, 2007 release explicitly stated that "No conclusion about the Phase 2 study can be drawn until the study is completed and the final data are analyzed and released in 2008." Hibbard Decl. Ex. K.

[11] Defendants' further argument that the results of phase 2 really were "strong" and "spectacular," Mot. at 11-12, invites a weighing of evidence that is not appropriate at this phase of the case.

11

1  tests, see Opp. at 8– then these allegations might have merit.  But the Complaint does not go
2  that far.  While the Complaint does allege that the ADAS-cog and DAD were the
3  predetermined criteria by which Phase 2 would be tested, see, e.g., Compl. ¶¶ 10, 12, 16, 58,
4  it does not allege a basis for this assertion, and cites to no verbal or written statements by
5  Defendants setting out that criteria.  The Court cannot reasonably infer that Plaintiffs, or any
6  other investors, understood Defendants' decision to initiate Phase 3 trials as a statement that
7  Bapineuzumab had outperformed the placebo on the ADAS-cog and DAD tests.  To the
8  extent that the Plaintiffs rely on some confidential source of particulars for their allegations,
9  they have not cited it in their Complaint.  See Yourish v. Cal. Amplifier, 191 F.3d 983, 995
10 (9th Cir. 1999) ("some detail about the alleged information, other than that its substance
11 contradicted the substance of the identified statement, must be provided"); see also Silicon
12 Graphics, 183 F.3d at 984 ("a plaintiff must provide, in great detail, all the relevant facts
13 forming the basis of her belief.  It is not sufficient for a plaintiff's pleadings to set forth a
14 belief that certain unspecified sources will reveal, after some discovery, facts that will
15 validate her claim.").[12]  Accordingly, Defendants' statements about commencing the phase 3
16 trials do not adequately allege falsity.

### 2. Falsity: Statements About Results of Phase 2

The Complaint's second set of Bapineuzumab allegations pertain to the June 17, 2007 press release announcing the top-line results of the phase 2 trials.  Plaintiffs allege that the "June 17, 2008 press release was materially false and misleading because it failed to disclose the known, materially adverse results of the Phase 2 Alzheimer Study."  Compl. ¶ 83.  The Complaint lists several facts disclosed at the ICAD conference, but not in the June 17 press release, which Plaintiffs allege render the release misleading.  Id.  The Court disagrees.

Importantly, "Rule 10b-5 . . . prohibit[s] only misleading and untrue statements, not statements that are incomplete."  Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006

---

[12] For the same reasons, the Complaint's allegations that Defendants' June 11, 2008 statements "were false when made because the Company reported positive news about . . . Bapineuzumab both publicly and privately to institutional investors while concealing the fact that Bapineuzumab Phase 2 interim results had failed. . . . In fact, Bapineuzumab failed to outperform the placebo using the ADAS-cog and DAD in the interim review," Compl. ¶ 81, also fail as currently pleaded.

12

(9th Cir. 2002). "To be actionable under the securities laws, an omission must be misleading; in other words, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Id. The June 17, 2008 press release included discouraging news ("Primary Efficacy Endpoints in Overall Study Population Not Statistically Significant," "In carriers, serious adverse events were more frequently observed in bapineuzumab-treated patients," "vasogenic edema was reported in the treated population with an increased frequency in carriers and at higher doses"), as well as encouraging news ("In non-carriers of the Apolipoprotein (ApoE4) allele . . . post-hac analysis showed statistically significant and clinically meaningful benefits associated with bapineuzumab treatment"), and it explicitly provided that more detailed data would be provided at the ICAD on July 29, 2008. Hibbard Decl. Ex. R. It did not "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." Brody, 280 F.3d at 1006.

Thus, the release's failure to mention that the phase 2 study showed no dose response does not render it misleading. The Credit Suisse report relied on in the Complaint surmised that "there were too few patients in this study to make meaningful comparisons between individual doses." Hibbard Decl. Ex. E.[13] The release's failure to mention that patients taking placebo showed a larger than expected cognitive decline does not render it misleading. The Chair of the Bapineuzumab Safety Monitoring Committee stated in a conference call cited by the Complaint, "I don't really think that . . . the deterioration in either of the groups is very much out of line and unexpected." See Hibbard Decl. Ex. G at 9.[14] Plaintiffs' disagreement about the importance of this data does not make the statement misleading. See Padnes v. Scios Nova Inc., No. 95-1693, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996). The release's failure to explain that it used curvilinear post hac analysis was also not misleading; the release acknowledged its use of post hac analysis. See Hibbard Decl. Ex. R.

---

[13] The Court can take judicial notice of this document as it was cited in the Complaint. See Silicon Graphics, 183 F.3d at 986.

[14] The Court can take judicial notice of this document as it was cited in the Complaint. See Silicon Graphics, 183 F.3d at 986.

13

The release's failure to state that there was no short-term advantage to taking Bapineuzumab did not render it misleading, as it nowhere suggested that there was a short-term advantage. The release's failure to state that, using the Mini Mental State Examination, there was no significant signal that Bapineuzumab worked better than placebo, also does not render it misleading, as Defendants apparently specified that it was only as to "the total population" (carriers and non-carriers) that MMSE was not significant. See Hibbard Decl. Ex. G at 17. The release's failure to state that nearly 10% of patients taking Bapineuzumab developed vasogenic edema, that there were three deaths in the Bapineuzumab group, and that there were other adverse affects of the drug did not render it misleading, either. The release spoke of "serious adverse events" in the Bapineuzumab group, and an increase in vasogenic edema. Hibbard Decl. Ex. R. Lastly, the release's failure to state that Bapineuzumab failed to show a statistically significant benefit compared to placebo "by a large margin" also does not render it misleading, as the release stated that the primary efficacy endpoints in the overall population were not statistically significant. Id.

Though the release did not contain all of the detail Plaintiffs would have liked, it was not misleading. See Brody, 280 F.3d at 1007 ("although the press release did not provide all the information that THC possessed about its possible sale, the information THC did provide– and the reasonable inferences one could draw from that information– were entirely consistent with the more detailed explanation of the merger process that Brody and Crawford argue the press release should have included"). "Defendants, like any other company wishing to publicly discuss the results of a scientific study, had to make a judgement as to which specific bits of information about the study and its conclusions to disclose." Padnes, 1996 WL 539711 at *5. Plaintiffs have failed to adequately allege "why the difference between the earlier and later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood." Id. The press release might have been

1  incomplete, but, as currently pleaded, it was not misleading.  Defendants' statements about
2  the results of Phase 2 are not actionable as currently pleaded.[15]

3  Accordingly, the Complaint fails to adequately allege falsity as to the Bapineuzumab
4  statements.  The Court therefore dismisses the Bapineuzumab claims with leave to amend.

### C. Section 20(a)

Defendants argue that the Court should dismiss the "control person" claims under section 20(a) of the Securities Exchange Act, because Plaintiffs have failed to allege a primary violation of the securities laws.  See Mot. at 25 (citing Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir 2000).  For the same reasons the Court dismisses the primary violations claims, it also dismisses the section 20(a) claims.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion, with leave to amend.  Plaintiffs must amend, if they choose to do so, within thirty (30) days of this Order.

**IT IS SO ORDERED.**

Dated:  February 9, 2011

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

---

[15] The Court does not address Defendants' further argument that the statements were protected by the Safe-Harbor Rule.  See Mot. at 17-18.